UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | |
|---|---|
| PATRICK MAINA, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| vs. ) | 1:15-cv-00113-RLY-DML |
| ) | |
| LORETTA E. LYNCH, Attorney General ) | |
| of the United States, JEH JOHNSON, ) | |
| Secretary of the U.S. Department of ) | |
| Homeland Security, and KAMSING V. ) | |
| LEE, Field Office Director of the United ) | |
| States Citizenship and Immigration ) | |
| Services, ) | |
| ) | |
| Defendants. ) | |

**ENTRY ON DEFENDANTS' MOTION FOR PARTIAL SUMMARY JUDGMENT**

Plaintiff, Patrick Maina, is a citizen of Kenya. He obtained lawful permanent resident status in May 2006 after marrying a U.S. citizen, and now wants to become a U.S. citizen himself. He applied for naturalization, but the United States Citizenship and Immigration Services ("USCIS") denied his application because he allegedly provided false testimony during his interview. The Department of Homeland Security ("DHS") subsequently initiated removal proceedings, alleging that Plaintiff's marriage–the one that allowed him to procure permanent residence in the U.S.–was a sham. Plaintiff then filed this suit against Defendants, Loretta E. Lynch, U.S. Attorney General, Jeh Johnson, Secretary of DHS, and Kamsing V. Lee, Field Office Director of USCIS, to redress the denial of his application for naturalization.

The court dismissed two of Plaintiff's claims for lack of subject matter jurisdiction, and, in his two remaining claims, Plaintiff seeks (1) a *de novo* review of his application pursuant to Section 310(c) of the Immigration and Nationality Act, codified at 8 U.S.C. § 1421(c), and (2) a declaratory judgment that he meets all the statutory requirements for naturalization pursuant to 28 U.S.C. § 2201(a).  Defendants now move for summary judgment on the two remaining claims.  Defendants contend that Plaintiff is not qualified for naturalization because he is not a person of good moral character.  Because there are genuine disputes of material fact on that point, the court **DENIES** Defendants' motion.

## I. Summary Judgment Standard

"Summary judgment is appropriate only where there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law." *Boss v. Castro*, 816 F.3d 910, 916 (7th Cir. 2016) (citing Fed. R. Civ. P. 56(a)).  The court construes all facts and reasonable inferences in favor of the non-moving party.  *Formella v. Brennan*, 817 F.3d 503, 510 (7th Cir. 2016).

## II. Statement of Facts

### A.  Plaintiff's Entry into the United States

Plaintiff is a native and citizen of Kenya.  (Filing No. 53-2, Ex. 1 at 1).  On August 3, 2001, Plaintiff was admitted to the United States on an F1 student visa.  (*Id.* at 4).  Plaintiff received a student visa on a commitment to attend Texas Southern University ("TSU") in Houston, Texas from August 3, 2001 to December 10, 2005.  (*Id.*, Ex. 2 at 1).

Plaintiff did not enroll at TSU, but instead moved to Fort Wayne, Indiana.  (*Id.*, Ex. 3 at 2).

### B. Plaintiff's Marriage and Adjustment of Status

Plaintiff married Wanda Scott on April 14, 2004.  (*Id.*, Ex. 5).  Scott is a citizen of the United States by birth.  (Filing No. 53-3, Ex. 6 at 1).  On September 28, 2004, Scott filed a Form I-130, Petition for Alien Relative, with Plaintiff as the beneficiary.  (*Id.*).  Plaintiff simultaneously filed a Form I-485, Application to Adjust or Register Permanent Resident Status, and a Form G-325, Biographic Statement.  (*Id.*, Ex. 7; *Id.*, Ex. 9).  Both Scott and Plaintiff indicated that they lived at 10615 Lake Tahoe Drive, Fort Wayne, Indiana on their respective forms.  (Ex. 6 at 1; Ex. 7 at 1).  On Plaintiff's Biographic Statement, he stated that he had lived at Lake Tahoe Drive since July 2001.  (Ex. 9 at 1).  According to Plaintiff, an attorney and her staff prepared the documents.  (Filing No. 56-2, Deposition of Plaintiff 94:1-5).  Plaintiff and Scott signed their respective forms "without paying particular attention."  (*Id.* 94:7-9).

On December 13, 2005, USCIS Officer Joe Bishel interviewed Plaintiff and Scott together on Plaintiff's Form I-485 application and Scott's Form I-130 petition.  (Filing No. 53-3, Ex. 10 at 1).  During the interview, Plaintiff told Officer Bishel that he moved to 8205 Bridgeway Drive, Apt. 1C, Fort Wayne, Indiana in December 2004.  (Filing No. 53-3, Ex. 8. at 1).  Officer Bishel gave Plaintiff and Scott a Request for Evidence ("RFE") asking for "additional joint documents" showing they were in a bona fide marriage and a joint statement "stating when the two of you have been living together."

3

(Filing No. 53-4, Ex. 11). On March 21, 2006, Plaintiff and Scott responded with a signed statement:

> We lived with Wanda Maina from November 2003 to October 2004. the differences came in when she lost her job and we had a mortgage which she was trying to save through her mum and brothers but to me it wasn't realistic because we couldn't keep up as the rent and utilities were too high. There was a lot of tension and we had to go our separate ways first as we tried to solve the problem. Finally when she came to reality we lost the house and we moved in together in feburuary of 2005. happy since then despite some marriage problems here and there but we solve them. (sic)

(*Id.*, Ex. 12).

When presented with this document at her deposition, Scott testified that the statement about the two of them moving back in together in 2005 is not true, (Filing No. 53-8, Ex. 30, Deposition of Wanda Scott 97:4-10), she and Plaintiff only solved their problems as "mutual friends," not "relationship-wise," (*id.* 97:11-19), and they "never got back together" in terms of having a relationship. (*Id.* 97:17-19). Plaintiff disagreed. When asked if he and Scott were "happily together" in February/March 2005, he said, "Yeah, we would see each other. . . . Yeah, we'd do whatever married couples are doing at the moment." (Plaintiff Dep. 104:21-105:1). He was directly asked if he and Scott were living together at that time, and he responded, "She would visit me in South Bridge. . . . But visiting me and living half time. I assumed we were together." (*Id.* 105:2-6).

On May 2, 2006, USCIS approved Scott's Form I-130 petition and Plaintiff's Form I-485 adjustment application, and Plaintiff was granted lawful permanent resident status. (Ex. 6 at 1; Ex. 7 at 1).

4

### C. Plaintiff's Divorce

On October 3, 2006, Scott filed a Verified Petition for Dissolution of Marriage. *See In Re: the Marriage of Wanda I Scott and Patrick Maina*, Cause No. 02C01-0610-DR-000776. On December 18, 2006, Scott filed a Settlement Agreement and Decree of Dissolution of Marriage. (*See* Filing No. 57-1, Ex. 13). In the Settlement Agreement, Plaintiff listed the Bridgeway Drive apartment as his address. (*Id.* at 4). On December 18, 2006, the Allen Circuit Court approved the agreement and entered a decree dissolving Scott and Plaintiff's marriage. (*Id.*).

### D. Plaintiff's Naturalization Application and Interview

On May 9, 2013, Plaintiff filed a Form N-400, Application for Naturalization. (Filing No. 57-2, Ex. 14 at 1). Part 6, Question A, of the application asked Plaintiff to list every place he lived for the last five years. Plaintiff listed three addresses:

| Address | From | To |
| --- | --- | --- |
| 717 West Dewald, Fort Wayne, IN | 05/02/2011 | Present |
| 912 West Dewald, Fort Wayne, IN | 10/25/2010 | 05/02/2011 |
| 2221 Point West Dr. #3, Fort Wayne, IN | 09/05/2005 | 10/25/2010 |

(*Id.* at 4). Part 10, Question 23 of the application asked "Have you ever given false or misleading information to any U.S. Government official while applying for any immigration benefit or to prevent deportation, exclusion, or removal?" and Plaintiff answered "No." (*Id.* at 7).

On August 5, 2013, USCIS officer Erica Marston-Byrnes interviewed Plaintiff under oath regarding his naturalization application. (*Id.* at 11). When Officer Marston-Byrnes interviews applicants, she follows the regular agency practice of taking notes in

red ink on the application to reflect the applicant's oral answers under oath as compared to the written answers on the application. (Filing No. 53-8, Ex. 32, Deposition of Erica Marston-Byrnes at 58:1-10). She places checks by answers where the applicant orally confirmed the answer written on the application. (*Id.* 58:24-59:5). When Officer Marston-Byrnes makes a change based on the applicant's oral answer, she circles that part of the application and then numbers it. (*Id.* at 58:1-10). It is common for an applicant to make "a lot" of mistakes when filling out a Form N-400. (*Id.* 23:23-24:3). Plaintiff's application contained ten corrections, including an omitted arrest, two omitted travels outside the U.S., and a new current home address. (*See* Ex. 14). Officer Marston-Byrnes noted that ten changes is not "a lot," but is actually "about average." (Marston-Byrnes Dep. 25:10-14). After an interview, Officer Marston-Byrnes reviews "each and every change" with the applicant, has the applicant sign, and then signs herself. (*Id.* 68:15-23).

     Officer Marston-Byrnes testified that she asked Plaintiff if the addresses listed in Part 6, Question A, were correct, and he orally confirmed under oath that he lived at those three addresses for the time periods listed. (*Id.* 61:10-62:20). There are red check marks by each of the three addresses. (*See* Ex. 14 at 3). If Plaintiff indicated that any of the addresses were incorrect, she "would have marked them out." (Marston-Byrnes Dep. 64:19-22). Officer Marston-Byrnes claims Plaintiff referred to the Point West Drive address as "South Bridge" during the interview, (*Id.* 62:17-20, 63:24-64:9), but Plaintiff maintains that he was thinking of the 8205 Bridgeway Drive address when he mentioned "the South Bridge apartment." (Plaintiff Dep. 120:17-121:15).

6

Officer Marston-Byrnes added two addresses to Plaintiff's application. First, Plaintiff explained that he had moved since filing the application, meaning that his current address had changed. (Marston-Byrnes Dep. 60:17-61:7). Second, she asked where he had lived prior to 2221 Point West Drive, the earliest address he listed. (*Id.* 62:10-16). Therefore, after the amendments offered during the interview, Plaintiff's list of addresses was as follows:

| Address | From | To |
|---|---|---|
| 12705 Braddock, Noblesville, IN | 08/02/2013 | Present |
| 717 West Dewald, Fort Wayne, IN | 05/02/2011 | 04/26/2013 |
| 912 West Dewald, Fort Wayne, IN | 10/25/2010 | 05/02/2011 |
| 2221 Point West Dr. #3, Fort Wayne, IN | 09/05/2005 | 10/25/2010 |
| Rosewood Drive, Fort Wayne, IN | 2002 | 09/2005 |

Officer Marston-Byrnes testified that she asked Plaintiff Question 23 from part 10 of the Form N-400, "Have you ever given false or misleading information to any U.S. Government official while applying for any immigration benefit or to prevent deportation, exclusion, or removal?" and Plaintiff orally confirmed his answer of "No." (*Id.* 70:21-71:8). At the conclusion of the interview, Plaintiff signed the Form N-400, attesting under penalty of perjury "that I know that the contents of this application for naturalization subscribed by me, including corrections numbered 1 through 10 . . . are true and correct to the best of my knowledge and belief." (Ex. 14 at 10).

### E.  USCIS Investigation

USCIS Officer Darrell Morton subsequently conducted an investigation of Plaintiff's answers from his application and interview. (*See* Filing No. 53-4, Ex. 15). Officer Morton obtained leases that Plaintiff entered for 8205 Bridgeway Drive, Apt. 1C

from October 1, 2004 through September 30, 2011. (*Id.* at 3). A chart comparing the information from Plaintiff's application and interview to Officer Morton's investigation is below.

| Plaintiff's Application | | | Officer Morton's Investigation | | |
|---|---|---|---|---|---|
| Address | From | To | Address | From | To |
| 12705 Braddock, Noblesville, IN | 08/02/2013 | Present | | | |
| 717 West Dewald, Fort Wayne, IN | 05/02/2011 | 04/26/2013 | | | |
| 912 West Dewald, Fort Wayne, IN | 10/25/2010 | 05/02/2011 | 8205 Bridgeway Dr., Apt. 1C, Fort Wayne, IN | 10/01/2004 | 09/30/2011 |
| 2221 Point West Dr. #3, Fort Wayne, IN | 09/05/2005 | 10/25/2010 | | | |
| Rosewood Drive, Fort Wayne, IN | 2002 | 09/2005 | 8206 Bridgeway Circle, Apt. 2B, Fort Wayne, IN | 03/11/2003 | 04/12/2004 |

### F. USCIS' Denial of Plaintiff's Naturalization Application

On May 29, 2014, USCIS issued a Notice of Intent to Deny ("NOID") Plaintiff's naturalization application with a detailed summary of the information USCIS gathered during its investigation, giving Plaintiff an opportunity to respond. (Filing No. 53-5, Ex. 16). On July 2, 2014, Plaintiff responded to the NOID with an affidavit. (*See* Filing No. 53-5, Ex. 17). The affidavit stated, in part:

> This address [referring to 2221 Point West Drive] was indicated on my application or testimony out of complete confusion. That address was not intended to conceal any information from immigration. I may have been just inattentive. In fact, I resided at this address in 2001 when I just arrived in the United States. Since then, I resided in numerous other addresses that I cannot even recall. First, when we filed our papers in 2004, we used our address at the time, i.e., 10615 Lake Tahoe Drive, Fort Wayne, Indiana. In addition, I did a change of address with the immigration service around April 2006 and provided the address 8205-1C, Fort Wayne, Indiana. In fact, I received my green card at this particular Bridgeway address. I certainly was aware that immigration service would have both addresses.

8

(*Id.* at 2-3).

On July 15, 2014, USCIS denied Plaintiff's naturalization application for lack of good moral character on the grounds that he gave false testimony for the purpose of obtaining an immigration benefit. (Filing No. 53-5, Ex. 18). On August 5, 2014, Plaintiff filed a Form N-336, Request for a Hearing on a Decision in Naturalization Proceedings, thereby appealing USCIS' denial. (Filing No. 53-5, Ex. 19). On October 17, 2014, USCIS denied Plaintiff's administrative appeal. (Filing No. 53-6, Ex. 21).

### G. Plaintiff's Removal Proceedings

After USCIS denied Plaintiff's naturalization application on appeal, DHS issued a Notice to Appear ("NTA"), thereby placing him in removal proceedings. (Filing No. 53-7, Ex. 27 at 1; *Id.*, Ex. 28 at 1). Plaintiff is charged with making material misrepresentations in his adjustment and naturalization proceedings. (*Id.*).

## III. Discussion

### A. Naturalization Standard

American citizenship is "a priceless treasure," *Johnson v. Eisentrager*, 339 U.S. 763, 791 (1950) (Black, J., dissenting), that should not be "casually conferred." *Fedorenko v. United States*, 449 U.S. 490, 520 n.3 (1981) (Blackmun, J., concurring). As Justice Blackmun noted, "The freedoms and opportunities secured by United States citizenship long have been treasured by persons fortunate enough to be born with them, and are yearned for by countless less fortunate." *Id.* at 522 (Blackmun, J., concurring). Indeed, former Chief Justice Warren described citizenship as "man's basic right for it is

nothing less than the right to have rights." *Perez v. Brownell*, 356 U.S. 44, 64 (1958) (Warren, J., dissenting). Accordingly, the Supreme Court has instructed that "there must be strict compliance with all the congressionally imposed prerequisites to the acquisition of citizenship." *Fedorenko*, 449 U.S. at 506. To qualify for naturalization, an individual must demonstrate that he:

1. has resided continuously in the United States for at least five years immediately prior to applying for naturalization after first "being lawfully admitted for permanent residence," has been physically present in the United States for at least half of those five years, and has resided within the state in which the individual applied for at least three months;

2. "has resided continuously within the United States from the date of the application up to the time of admission to citizenship"; and

3. during all of these periods, "has been and still is a person of good moral character, attached to the principles of the Constitution of the United States, and well disposed to the good order and happiness of the United States."

8 U.S.C.§ 1427(a).

Because "the Government has a strong and legitimate interest in ensuring that only qualified persons are granted citizenship," the burden is on the hopeful citizen "to show his eligibility for citizenship in every respect" during this review. *Berenyi v. Dist. Dir.*, 385 U.S. 630, 637 (1967). *See* 8 U.S.C.§ 1427(e); 8 C.F.R. § 316.10(a)(2). All doubts must be resolved in favor of the United States and against the applicant. *United States v. Macintosh*, 283 U.S. 605, 626 (1931).

B. **Good Moral Character**

For purposes of this motion, the Government only challenges the third requirement listed in Section 1427(a), arguing that Plaintiff does not possess the good moral character necessary to be naturalized. Rather than specifically defining the term "good moral character," Congress provided example classes of applicants who cannot satisfy this requirement. These include "a habitual drunkard," "one whose income is derived principally from illegal gambling activities," and, most relevant here, "one who has given false testimony for the purpose of obtaining any benefits under this Act." 8 U.S.C. § 1101(f). The list is not exclusive though. *See id.* ("The fact that any person is not within any of the foregoing classes shall not preclude a finding that for other reasons such person is or was not of good moral character."). USCIS is required to "evaluate claims of good moral character on a case-by-case basis" by considering the statutory examples in Section 1101(f) and "the standards of the average citizen in the community of residence." 8 C.F.R. § 316.10(a)(2). Importantly, courts "do not require perfection in our new citizens." *Klig v. United States*, 296 F.2d 343, 346 (2d Cir. 1961).

The statutory period for assessing the moral character of an applicant begins five years immediately preceding the date the application is filed. 8 U.S.C. § 1427(a). Nonetheless, USCIS may consider "the applicant's conduct and acts at any time prior to that period," 8 U.S.C. § 1427(e), if they "appear relevant to a determination of the applicant's present moral character." 8 C.F.R. § 316.10(a)(2). *See Nyari v. Napolitano*, 562 F.3d 916, 920 (8th Cir. 2009) ("[A]n applicant's conduct prior to the statutory period

is relevant only to the extent that it reflects on his or her moral character within the statutory period.").

### C. Giving False Testimony

Defendants aver that Plaintiff gave false testimony in order to obtain immigration benefits. Such a finding would be fatal to Plaintiff's claims pursuant to the plain language of 8 U.S.C. § 1101(f)(6). The Supreme Court has narrowly interpreted this provision to require "oral statements made under oath" that are "made with the subjective intent of obtaining immigration benefits." *Kungys v. United States*, 485 U.S. 759, 780 (1988). It does not apply to concealments, falsified documents, or misrepresentations made for other reasons, such as embarrassment or a desire for privacy. *Id.* at 780-81. Importantly, Section 1101 does not require that the false testimony be *material* in order to undermine an applicant's good moral character: "[The statute] denominates a person to be of bad moral character on account of having given false testimony if he has told even the most immaterial of lies with the subjective intent of obtaining immigration or naturalization benefits." *Id.* at 780.

### D. Plaintiff's Moral Character

Defendants offer two primary arguments in support of their motion: Plaintiff does not possess the good moral character necessary for naturalization because he gave false testimony (1) about his addresses and (2) about not providing false or misleading information while applying for adjustment of status. To bolster those claims, Defendants also discuss other conduct outside of the five-year statutory period that is allegedly

relevant to Plaintiff's present moral character, including entering the United States under false pretenses and providing false information to the Internal Revenue Service ("IRS").[1]

### 1. False Testimony Regarding Addresses

First, Defendants argue that Plaintiff gave false testimony about his addresses in his naturalization interview with Officer Marston-Byrnes. There is no dispute that Plaintiff failed to provide the correct addresses when he applied for naturalization. Plaintiff readily concedes that he should have written 8205 Bridgeway Drive, Apartment 1C instead of 2221 Point West Drive #3. There is also no genuine dispute that Plaintiff orally confirmed the incorrect address under oath in his interview. Plaintiff attempts to raise some doubt about this point by noting that the interview was not recorded and he mentioned "the South Bridge apartment," but neither of these facts contradict Officer Marston-Byrnes' testimony or the red check marks next to each address on the Form N-400.

However, there is a genuine dispute of material fact as to Plaintiff's intent when he gave this false testimony. The statute invoked by Defendants plainly requires a showing that the applicant lied "for the purpose of obtaining" immigration benefits. 8 U.S.C. § 1101(f)(6). As a general rule, "[i]t is rarely appropriate on summary judgment for a

---

[1] In this section of Defendants' opening brief, they include a short footnote suggesting that if Plaintiff did lie to the IRS in his tax filings, he committed tax fraud, which constitutes a crime involving moral turpitude that precludes naturalization. (Filing No. 53 at 32 n.10). Plaintiff responds in kind, with a quick, two-sentence rebuttal. (Filing No. 56 at 33). Then, in their reply brief, Defendants turn their undeveloped footnote into a substantial argument that exceeds four pages, as if to suggest this is an independent basis for granting summary judgment. (Filing No. 57 at 16-20). The court considers this a new argument raised for the first time in a reply brief. It is therefore waived. *United States v. Lacy*, 813 F.3d 654, 658 (7th Cir. 2016).

13

district court to make a finding on state of mind." *McGreal v. Ostrov*, 368 F.3d 657, 677 (7th Cir. 2004). *See Ashman v. Barrows*, 438 F.3d 781, 784 (7th Cir. 2006) ("We are particularly leery of resolving issues involving a state of mind on summary judgment."). This is not to say that a special summary judgment standard applies for claims involving intent. *Simpson v. Beaver Dam Cmty. Hosps., Inc.*, 780 F.3d 784, 789 (7th Cir. 2015). Rather, the language from *McGreal* and *Ashman* "really means . . . just that courts should be careful . . . not to grant summary judgment if there is an issue of material fact that is genuinely contestable, which an issue of intent often though not always will be." *Wallace v. SMC Pneumatics*, 103 F.3d 1394, 1396 (7th Cir. 1997) (*quoted in Simpson*, 780 F.3d at 789).

In this case, there is no direct evidence that Plaintiff lied for the purpose of illegally procuring immigration benefits. Defendants must therefore rely upon circumstantial evidence. Intent can, of course, be proven through circumstantial evidence, but a well-reasoned argument must be made to the court. Here, Defendants do not squarely address Plaintiff's intent in their briefing. They routinely conclude that he had the requisite intent, but they fail to provide any actual analysis on that point. On the other hand, in his response to the NOID, Plaintiff claimed that he listed incorrect addresses and then confirmed them at the interview "out of complete confusion" and not to "conceal any information from immigration." (Ex. 17 at 2). This creates a genuine dispute of material fact that requires a trial. Defendants attempt to overcome this by attacking Plaintiff's credibility and suggesting that the court weigh his evidence against his "repeated false representations" and "the lack of plausibility of his claims." (Filing

14

No. 57 at 14-15). This is not the role of a court on summary judgment. *See Miller v. Gonzalez*, 761 F.3d 822, 827 (7th Cir. 2014) ("[A court's] job when assessing a summary judgment motion is not to weigh evidence, make credibility determinations, resolve factual disputes and swearing contests, or decide which inferences to draw from the facts.").

### 2. False Testimony Regarding Previously Giving False Information

Second, Defendants contend that Plaintiff gave false testimony when he orally confirmed that he had not provided false or misleading information while applying for adjustment of status. Plaintiff allegedly lied three times during his adjustment process: (1) in the affidavit Plaintiff and Scott submitted in response to the RFE, they wrote that they had moved in together in February 2005; (2) in that same affidavit, Plaintiff and Scott wrote that they were happily married; and (3) in his Form G-325, Biographic Statement, Plaintiff wrote that he lived at the Lake Tahoe Drive address from July 2001 until he submitted the form in September 2004. At least the first two of these "lies" are disputed though. For example, regardless of how Scott felt, it seems Plaintiff thought he and Scott had a normal, happy marriage. (Plaintiff Dep. 104:21-105:6). Nonetheless, even assuming, *arguendo*, that these three alleged lies go undisputed, the court must still find a genuine dispute of material fact on Plaintiff's intent because Defendants neglect to clearly address it.

## IV. Conclusion

Therefore, Defendants' Motion for Partial Summary Judgment (Filing No. 52) is **DENIED**.


**SO ORDERED** this 27th day of June 2016.

                                                _____
                                                RICHARD L. YOUNG, CHIEF JUDGE
                                                United States District Court
                                                Southern District of Indiana


Distributed Electronically to Registered Counsel of Record.